GAYNOR-STAFFORD INDUSTRIES, INC. *v.* WATER
POLLUTION CONTROL AUTHORITY OF THE
TOWN OF STAFFORD ET AL.
(11850)

PETERS, PARSKEY, SHEA, GRILLO and MENT, Js.

Argued January 13—decision released April 10, 1984

*Thomas A. Rouse,* with whom were *Barry S.
Feigenbaum* and, on the brief, *Martin H. Sokolow, Jr.,*
for the appellant (plaintiff).

*Edward Muska,* for the appellees (defendants).

SHEA, J. The plaintiff, Gaynor-Stafford Industries, Inc., pursuant to General Statutes § 7-250,[1] appealed to the Superior Court from a benefit assessment levied on its property by the defendant,[2] the Stafford water pollution control authority (hereinafter WPCA). The trial court upheld the benefit assessment, and the plaintiff has appealed from that judgment. The plaintiff maintains that the court erred in finding (1) that the assessment was authorized by General Statutes § 7-249a;[3] (2) that General Statutes § 7-249a is constitutional; (3) that the benefit assessment was properly conducted in accordance with General Statutes § 7-249;[4]

---

[1] General Statutes § 7-250 provides in pertinent part: "Any person aggrieved by any assessment may appeal to the superior court for the judicial district wherein the property is located and shall bring any such appeal to a return day of said court not less than twelve nor more than thirty days after service thereof and such appeal shall be privileged in respect to its assignment for trial."

[2] The town of Stafford was also named as a defendant.

[3] General Statutes § 7-249a provides: "Notwithstanding the provisions of section 7-249, any municipal water pollution control authority which constructs any sewerage system or portion thereof, with federal financial assistance under the provisions of the Federal Water Pollution Controls Act Amendments of 1972, P.L. 92-500, as from time to time amended, may, in lieu of or in addition to, levying benefit assessments in accordance with the provisions of said section 7-249, assess industrial users of the portion of the sewerage system constructed with federal financial assistance for the cost of construction of such portion to the extent such cost is attributable to the treatment of such industrial users' wastes. In determining such assessments, the municipal water pollution control authority may establish such classifications as may be approved by the administrator of the United States Environmental Protection Agency and the commissioner of environmental protection."

[4] "[General Statutes] Sec. 7-249. ASSESSMENT OF BENEFITS. At any time after a municipality, by its water pollution control authority, has acquired or constructed, a sewerage system or portion thereof, the water pollution control authority may levy benefit assessments upon the lands and buildings in the municipality which, in its judgment, are especially benefited thereby, whether they abut on such sewerage system or not, and upon the owners of such land and buildings, according to such rule as the water pol-

and (4) that participation by a member of the WPCA in the determination of the assessment was not prohibited because of disqualification for financial interest.

lution control authority adopts, subject to the right of appeal as hereinafter provided. Benefits to buildings or structures constructed or expanded after the initial assessment may be assessed as if the new or expanded buildings or structures had existed at the time of the initial assessment. Such benefits and benefits to anticipated development of land zoned for other than business, commercial or industrial purposes or land classified as farm land, forest land or open space land on the last completed grand list of the municipality in which such land is located, pursuant to the provisions of sections 12-107a to 12-107e, inclusive, shall not be assessed until such construction or expansion or development is approved or occurs. In case of a property so zoned or classified which exceeds by more than one hundred percent the size of the smallest lot permitted in the lowest density residential zone allowed under zoning regulations or, in the case of a town having no zoning regulations, a lot size of one acre in area and one hundred fifty feet in frontage, assessment of such excess land shall be deferred until such time as such excess land shall be built upon or a building permit issued therefor or until approval of a subdivision plan of such excess property by the planning commission having jurisdiction, whichever event occurs first at which time assessment may be made as provided herein. No lien securing payment shall be filed until the property is assessed. The sum of initial and subsequent assessments shall not exceed the special benefit accruing to the property. Such assessment may include a proportionate share of the cost of any part of the sewerage system, including the cost of preliminary studies and surveys, detailed working plans and specifications, acquiring necessary land or property or any interest therein, damage awards, construction costs, interest charges during construction, legal and other fees, or any other expense incidental to the completion of the work. The water pollution control authority may divide the total territory to be benefited by a sewerage system into districts and may levy assessments against the property benefited in each district separately. In assessing benefits against property in any district the water pollution control authority may add to the cost of the part of the sewerage system located in the district a proportionate share of the cost of any part of the sewerage system located outside the district but deemed by the water pollution control authority to be necessary or desirable for the operation of the part of the system within the district. In assessing benefits and apportioning the amount to be raised thereby among the properties benefited, the water pollution control authority may give consideration to the area, frontage, grand list valuation and to present or permitted use or classification of benefited properties and to any other relevant factors. The water pollution control authority may make reasonable allowances in the case of properties having a frontage on more than one street and whenever for any reason the particular situa-

There is no substantial dispute concerning the facts: In 1967, Stafford was ordered by the water resources commission (the predecessor of the department of environmental protection) to develop a pollution abatement system for the Willimantic River. A preliminary study was done in 1968 to determine the amount of sewage created by the town, including a study of the flow of wastewater created by various industries in the town. In reliance upon the figures presented in the preliminary study, a wastewater treatment plant with a capacity to process 2,000,000 gallons of sewage per day was designed.

The town applied for federal and state financial assistance for construction of the designed facility, and received approval from the federal government in September, 1970. Construction was completed in 1974 with the total cost of construction exceeding $2,500,000. The town's portion of the capital cost of construction was $383,251.78.

In 1979, the town was informed that in order to retain the federal grant given the town it would have to institute an industrial cost recovery plan to recover that portion of the town's share of capital cost attributable to the treatment of industrial wastewater.[5] A consultant was hired by the WPCA to prepare a report, and on June 3, 1980, the water pollution control authority

tion of any property requires an allowance. Revenue from the assessment of benefits shall be used solely for the acquisition or construction of the sewerage system providing such benefits or for the payment of principal of and interest on bonds or notes issued to finance such acquisition or construction. No assessment shall be made against any property in excess of the special benefit to accrue to such property. The water pollution control authority shall place a caveat on the land records in each instance where assessment of benefits to anticipated development of land zoned for other than business, commercial or industrial purposes or land classified as farm land, forest land or open space land has been deferred."

[5] The federal requirement was a precondition to receiving the federal grant at the time it was approved. See Amendments to Regulation 601 Subpart B, 35 Fed. Reg. 10757 (1970) (codified at 18 C.F.R. § 601.34 [1971]).

voted to approve the report and levy assessments according to the recommendation contained in the report.

## I

In its first claim of error, the plaintiff maintains that the method of assessment adopted by the WPCA was not authorized by General Statutes § 7-249a, one of the statutes relied upon by the trial court in upholding the assessment.

When construing statutes we have frequently stated that where the language is clear and unambiguous the statute will be applied as its terms direct. See *Duguay* v. *Hopkins,* 191 Conn. 222, 228, 464 A.2d 45 (1983); *Mobil Oil Corporation* v. *Westport,* 182 Conn. 554, 558, 438 A.2d 768 (1980); *In re Petition of State's Attorney, Cook County, Illinois,* 179 Conn. 102, 107, 425 A.2d 588 (1979).

General Statutes § 7-249a is expressly limited in scope and application to the recovery of *federal* funds used for the cost of construction of sewerage systems "to the extent that such cost is attributable to the treatment of such industrial users' wastes." A benefit assessment is authorized only when the sewerage system was constructed "with federal financial assistance under the provisions of the Federal Water Pollution Controls Act Amendments of 1972, P.L. 92-500."[6] Neither requirement was fulfilled in this case. The assessment formula adopted by the WPCA recovers the local funds used for constructing the sewerage system, not the federal funds. Furthermore, the sewerage system was constructed with federal financial assistance under the Federal Water Pollution Control Act of 1948; 33 U.S.C.A. §§ 466 through 466n (1970 Sup.); not with

[6] See footnote 3, supra, for the full text of General Statutes § 7-249a.

funds contributed under the 1972 act.[7] The trial court erred, therefore, in finding that the WPCA's method of assessment was authorized by General Statutes § 7-249a.[8]

## II

The judgment upholding the assessment may, nonetheless, be affirmed if the assessment was proper, as the trial court found, under General Statutes § 7-249. The plaintiff claims that the assessment was not proper under General Statutes § 7-249 because the WPCA relied upon construction cost as part of the method for formulating the assessment; the WPCA limited the assessment to industries discharging more than 25,000 gallons of waste per day in 1968; and the assessment exceeds the special benefit conferred. In order to address each claim, we must first set out the formula adopted by the WPCA.

After being informed that it was required to devise an equitable method of cost recovery, the town contracted with a consultant to make a study and submit an equitable method of cost recovery to the WPCA. The consultant's report, following federal guidelines

---

[7] We disagree with the WPCA's contention that, in referring to the 1972 act, the legislature was only employing the popular name of the act and not applying any substantive restrictions. The 1972 act effected substantial changes in the law concerning federal funding for wastewater treatment plants. One of the more important changes was the requirement that grantees of federal funds assure the federal agency that an equitable system for recovering the federal share of costs attributable to the treatment of industrial waste would be instituted. See 33 U.S.C.A. § 1284 (b) (1) (B) (1977 Sup.). Congress made clear, however, in the savings provision of the 1972 act that all grants given prior to the effective date of the 1972 act would be exempt from the 1972 act's requirements. See The Federal Water Pollution Controls Act Amendments of 1972, P.L. 92–500, §§ 4 (a) through 4 (c), 86 Stat. 816, 896–97 (1972).

[8] Our decision on this issue makes it unnecessary to reach the question concerning the statute's constitutionality as applied to the plaintiff. See *Bruno* v. *Civil Service Commission*, 192 Conn. 335, 352, 472 A.2d 328 (1984) (*Shea, J.*, concurring).

published by the environmental protection agency[9] and binding upon Stafford when it accepted federal financial aid,[10] listed all users of the treatment facility who, in 1968, were discharging more than 25,000 gallons of wastewater per day into the Willimantic River.[11] Of the four major polluters, the plaintiff's plant contributed the largest daily flow in 1968, 900,000 gallons of wastewater per day.

The report then established the fractional share of the treatment plant's total capacity intended to be used by each of the four users contributing more than 25,000 gallons of waste per day. The town's share of capital costs was then multiplied by each user's fractional share of the waste treatment plant's total capacity in order

---

[9] See Office of Water Program, U.S. Environmental Protection Agency, Federal Guidelines, Equitable Recovery of Industrial Waste Treatment Costs (1971).

[10] When the town's application for federal aid for construction costs was accepted in September, 1970, the federal regulations concerning equitable methods of cost recovery of local shares as a precondition to federal aid under the 1948 act were in effect. See footnote 5, supra.

[11] The consultant relied upon the 1968 waste flow charted in the preliminary study prepared for the town because the waste treatment facility had been designed with a total capacity large enough to handle the wastewater that was then being discharged. The figures are set out as follows:

"INDUSTRIAL FLOW CONTRIBUTIONS AND PERCENTAGES
1968 FLOW CONTRIBUTION-GPD

| Industry Name | Initial | Design | Percentage of STP Design Flow |
|---|---|---|---|
| AMF-CUNO | 54,250 | 54,250 | 2.7 |
| Hale Mnfg. Co. | 43,840 | 48,500 | 2.4 |
| Stafford Printers | 900,000 | 900,000 | 45.0 |
| Warren Woolen Co. | 208,200 | 210,000 | 10.5 |
| TOTALS | 1,206,290 | 1,212,750 | 60.6" |

By 1980, the plaintiff had ceased doing business in Stafford and was no longer contributing wastewater to the treatment plant.

to determine the amount of the assessment.[12] The WPCA adopted the formula and figures submitted and assessed each industrial user accordingly.

### A

The plaintiff claims that the method of assessment adopted by the WPCA was improper because it was based upon construction costs and applied only to industrial users who were contributing more than 25,000 gallons of wastewater to the river in 1968.

General Statutes § 7-249 contains broad provisions, permitting the WPCA to "give consideration to the area, frontage, grand list valuation and to present or permitted use or classification of benefited properties and to any other relevant factors." In this case, the WPCA relied upon the fractional share of the waste treatment plant's total capacity set aside for the individual industrial user's needs. Certainly, each industry's need to have available a method of treating its

---

[12] The formula and final computations are as follows:

"COMPUTATION OF ICR ESTIMATED CHARGES

| Industry | Computation | Est. Charges |
|---|---|---|
| AMF-CUNO | $\dfrac{54,250 \text{ GPD} \times \$383,251.78}{2,000,000 \text{ GPD}}$ | $ 10,395.70 |
| Hale Mfg. Co. | $\dfrac{48,500 \text{ GPD} \times \$383,251.78}{2,000,000 \text{ GPD}}$ | $ 9,293.86 |
| Stafford Printers | $\dfrac{900,000 \text{ GPD} \times \$383,251.78}{2,000,000 \text{ GPD}}$ | $172,463.30 |
| Warren Woolen Co. | $\dfrac{210,000 \text{ GPD} \times \$383,251.78}{2,000,000 \text{ GPD}}$ | $ 40,241.44 |
| TOTAL INDUSTRIAL SHARE | | $232,394.30 |
| ESTIMATED NET TOWN SHARE | | $150,857.48" |

The estimated net town share was recovered out of general revenues.

quantity of waste is a "relevant factor" when determining the special benefit conferred by construction of a waste treatment facility.

The WPCA limited the assessment to polluters contributing more than 25,000 gallons of wastewater per day to the river. We recently upheld a similar formula for determining who would be assessed. In *Mobil Oil Corporation* v. *Westport,* 182 Conn. 554, 438 A.2d 768 (1980), the town determined that all properties within a radius of 500 feet were benefited by the construction of a parking lot. We held that where the formula adopted bears a reasonable relationship to the benefits conferred the method of assessment would be upheld. See *Mobil Oil Corporation* v. *Westport,* supra, 561. We find nothing unreasonable about the formula adopted here by the WPCA.

Nor was it improper for the WPCA to rely upon the construction costs as a multiplier for determining the amount of the assessment. General Statutes § 7-249 permits the WPCA to "include a proportionate share of the cost of any part of the sewerage system, including . . . construction costs, interest charges during construction . . . or any other expense incidental to the completion of the work." The method for determining the amount of the assessment adopted by the WPCA is quite similar to the "front-foot rule"— a method of assessing approved by this court even though the dollar figure is derived by dividing the cost of construction "by the total frontage of land in the city upon the streets in which sewers might be constructed." *Bassett* v. *New Haven,* 76 Conn. 70, 73, 55 A. 579 (1903); see also *Katz* v. *West Hartford,* 191 Conn. 594, 603, 469 A.2d 410 (1983). We agree with the trial court that the WPCA adopted a permissible method for assessing special benefits.

## B

The plaintiff also claims that the defendants did not comply with General Statutes § 7-249 because the assessment exceeds the special benefit. The trial court found, however, that the assessment did not exceed the benefit.

Whether an assessment exceeds the special benefit is a question of fact subject to the clearly erroneous standard of review: "whether the facts set out in the memorandum of decision are supported by the evidence . . . ." *Pandolphe's Auto Parts, Inc.* v. *Manchester,* 181 Conn. 217, 221, 435 A.2d 24 (1980). The trial court's determination is amply supported by the evidence presented at trial.

An expert witness testifying on behalf of the defendants, who had visited the property several times, testified that the plaintiff's property was increased in value by $172,500 due to the construction of the waste treatment plant and its ability to treat the 900,000 gallons of waste created by the plaintiff's plant. He introduced a chart showing comparable sales and further testified that the "highest and best use" for the building was textile manufacturing. Although the plaintiff introduced conflicting testimony, the trial court was not obligated to accept the plaintiff's version of the facts.[13] The resolution of conflicting testimony is within the exclusive province of the trial court. *Gallicchio Bros., Inc.* v. *C & S Oil Co.,* 191 Conn. 104, 109, 463 A.2d 600 (1983).

## III

The plaintiff's final claim of error concerns William Sorenson's participation as a member of the WPCA in the vote adopting the method of assessment recommended by the consultant.

---

[13] The two expert witnesses who testified for the plaintiff had visited the plaintiff's place of business in Stafford only once. They testified that the highest and best use was for light manufacturing and warehousing.

Sorenson was a member of the WPCA when it voted in 1980 to approve the assessment. At that same time he was also an officer of Warren Woolen Company, one of the industrial users assessed by the defendants. The plaintiff maintains that, because of Sorenson's financial interest in Warren Woolen, he should have disqualified himself and that his failure to do so deprived the plaintiff of a fair and impartial tribunal for determining assessments.

"Public office is a trust conferred by public authority for a public purpose. *State ex rel. Stage* v. *Mackie,* 82 Conn. 398, 401, 74 A. 759 [1909]. His status forbids the public officer from placing himself in a position where his private interest conflicts with his public duty. The good faith of the official is of no moment because it is the policy of the law to keep him so far from temptation as to insure the exercise of unselfish public interest. He must not be permitted to place himself in a position in which personal interest may conflict with his public duty." *Low* v. *Madison,* 135 Conn. 1, 8, 60 A.2d 774 (1948). " 'The decision as to whether a particular interest is sufficient to disqualify is necessarily a factual one and depends on the circumstances of the particular case.' *Anderson* v. *Zoning Commission,* 157 Conn. 285, 290–91, 253 A.2d 16 (1968); see *Housing Authority* v. *Dorsey,* 164 Conn. 247, 252, 320 A.2d 820, cert. denied, 414 U.S. 1043, 94 S. Ct. 548, 38 L. Ed. 2d 335 (1973); *Lake Garda Improvement Assn.* v. *Town Plan & Zoning Commission,* 151 Conn. 476, 480, 199 A.2d 162 (1964); *Mills* v. *Town Plan & Zoning Commission,* 144 Conn. 493, 134 A.2d 250 (1957); 63 Am. Jur. 2d, Public Officers and Employees § 281. The test is not whether personal interest does, in fact, conflict, but whether it reasonably might conflict. *Josephson* v. *Planning Board,* 151 Conn. 489, 493–95, 199 A.2d 690 (1964)." *Thorne* v. *Zoning Commission,* 178 Conn. 198, 205, 423 A.2d 861 (1979).

At trial and on appeal, the plaintiff maintained that if the WPCA had chosen 1974 or 1980 as the year for determining the flow, the plaintiff's daily flow would have been less and Warren Woolen would then have had to pay a larger assessment, thus adversely affecting Sorenson's financial interest. The plaintiff's claim, however, is not borne out by the facts. As stated in part II of this opinion, each industry was assessed according to its individual fractional share of the waste treatment plant's total capacity. An increase in the plaintiff's daily flow used as a basis for its assessment would not change Warren Woolen's assessment which was based upon the relationship of its own daily flow to the total capacity of the plant.[14]

The plaintiff also claims that if Warren Woolen's daily flow was greater in 1974 or 1980, then its assessment would have been increased, thus resulting in a conflict with Sorenson's financial interest. The plaintiff did not, however, present any evidence to demonstrate that Warren Woolen's daily waste flow had increased since 1968 above the amount used in calculating its assessment. In fact, the plaintiff's allegations amount to mere speculation.

We recognize and reaffirm the principle first declared in *Low* v. *Madison,* supra, that the appearance of impropriety created by a public official's participation in a matter in which he has a pecuniary or personal interest is alone sufficient to require disqualification. This prophylactic rule serves the salutary purposes of promoting public confidence in the fairness of the

---

[14] In this regard, we note that Warren Woolen's daily discharge in 1968 was 208,200 gallons of waste per day. The treatment plant was designed, however, to handle 210,000 gallons of waste from the Warren Woolen's plant. See footnote 11, supra. Warren Woolen's assessment was, therefore, based upon the higher figure because that figure represented the actual fractional share of the waste treatment plant's total capacity set aside for Warren Woolen's waste. See footnote 12, supra.

decision-making process and preventing the public official from placing himself in a position where he might be tempted to breach the public trust bestowed upon him.[15] See *Thorne* v. *Zoning Commission, supra,* 203–205, and cases cited therein. "Whether a particular interest justifies disqualification is necessarily a factual question, for not every interest, no matter how remote and infinitesimal, may be said to possess the likely capacity to tempt the public official to depart from his sworn duty." 4 McQuillin, Municipal Corporations (3d Ed. Rev. 1979) § 13.35; *Armstrong* v. *Zoning Board of Appeals,* 158 Conn. 158, 171–72, 257 A.2d 799 (1969); *Anderson* v. *Zoning Commission,* 157 Conn. 285, 291, 253 A.2d 16 (1968); see also *North Hempstead* v. *North Hills,* 38 N.Y.2d 334, 342 N.E.2d 566, 379 N.Y.S.2d 792 (1975); *West Slope Community Council* v. *Tacoma,* 18 Wash. App. 328, 569 P.2d 1183 (1977); Anderson, American Law of Zoning (2d Ed. 1976) § 4.18; annot., 10 A.L.R.3d 694 (1966). Therefore, our prior cases have implicitly required a litigant to show the existence of a fact or set of facts that might reasonably be viewed as having an improper influence on the public official. For example, we have held that a zoning commissioner was disqualified from participating in zoning matters where the matter may have advanced the personal interests of the commissioner's relatives; *Thorne* v. *Zoning Commission, supra;* or where the matter may have advanced a pecuniary interest of an association of which the commissioner was president. *Daly* v. *Town Plan & Zoning Commission,* 150 Conn. 495, 191 A.2d 250 (1963). We have also held that a zoning commissioner was not similarly disqualified merely because he was

---

[15] The requirement that a public official disqualify himself from participating in the consideration of a matter in which he has either a pecuniary or personal interest necessarily implicates a collateral duty to apprise himself of all facts and circumstances surrounding the matter which might lead a reasonable disinterested person to question the public official's impartiality. Accord Code of Judicial Conduct, Canon 3C (2).

also a member of an association opposed to an applicant's request for a special permit; *Holt-Lock, Inc.* v. *Zoning & Planning Commission,* 161 Conn. 182, 286 A.2d 299 (1971); or because the law firm representing the applicant had in the past represented a corporation in which the commissioner owned a substantial amount of stock. *Anderson* v. *Zoning Commission,* supra; see also *Furtney* v. *Zoning Commission,* 159 Conn. 585, 589–94, 271 A.2d 319 (1970); *Armstrong* v. *Zoning Board of Appeals,* supra; cf. *State* v. *Jones,* 180 Conn. 443, 455, 429 A.2d 936 (1980) (entire state's attorney's office in a judicial district not disqualified where attorney-employee, who was disqualified, was forbidden from communicating with other attorneys about the case).

In the present case the plaintiff presented no evidence that Warren Woolen's daily wastewater flow has increased since 1968, the date chosen for determining the assessment. There is simply no evidence that Warren Woolen has been advantaged by the WPCA's decision to choose 1968 as the applicable date. It necessarily follows that Sorenson, an officer of Warren Woolen, had neither a personal nor pecuniary interest in the matter. If evidence had been produced which demonstrated that Warren Woolen could have benefited by the WPCA's selection of the assessment date, a different case would have been presented; but "we cannot say, in view of the manner in which this appeal has been presented to us, that as a matter of law the court reached an improper conclusion on the issue of [Sorenson's participation]." *Holt-Lock, Inc.* v. *Zoning & Planning Commission,* supra, 189.

There is no error.

In this opinion the other judges concurred.